**No. 25-3259**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

JOHN REAM,

*Plaintiff–Appellant*,

v.

U.S. DEPARTMENT OF THE TREASURY; SECRETARY SCOTT BESSENT; ALCOHOL AND TOBACCO TAX AND TRADE BUREAU; ADMINISTRATOR MARY G. RYAN,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
(No. 2:24-cv-0364, Hon. Edmund A. Sargus, Jr.)

---

# BRIEF OF AMICUS CURIAE AMERICANS FOR PROSPERITY FOUNDATION IN SUPPORT OF PLAINTIFF–APPELLANT AND REVERSAL

---

Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

*Attorney for Amicus Curiae*

July 1, 2025

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3259 Case Name: Ream v. Department of Treasury

Name of counsel: Michael Pepson

Pursuant to 6th Cir. R. 26.1, Americans for Prosperity Foundation
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on July 1, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Michael Pepson

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......................................................................... iii

INTEREST OF *AMICUS CURIAE* ....................................................................... 1

SUMMARY OF ARGUMENT ........................................................................ 1

ARGUMENT .................................................................................................... 4

I. Our System of Federalism Protects Liberty ............................................. 4

II. Legislative Power Is Not Plenary But Narrow and Limited ....................... 6

A. The Taxing Clause Only Empowers Congress to Pass Laws That Raise Revenue ........................................................................................................ 8

B. The Commerce Clause, As Originally Understood, Only Grants Congress Power to Regulate Interstate Trade and Transportation ......................... 10

C. The Necessary and Proper Clause Is Not a Free-Floating Source of Federal Power Untethered to Congress's Enumerated Powers ........................... 13

III. The At-Home Distilling Prohibition Exceeds Constitutional Limits on Federal Power ........................................................................................... 16

A. Congress's Taxing Power Cannot Save the Statute ............................... 17

B. The Interstate Commerce Power Cannot Justify the At-Home Distilling Ban Under Any Standard ..................................................................... 20

1. The At-Home Distilling Ban Is Unconstitutional Under the Original Understanding of the Commerce Clause ........................................... 20

2. The At-Home Distilling Ban Fails the Judicially Created "Substantial Effects" Test ............................................................................ 21

IV. The "Substantial Effects" Test Has No Basis In the Constitution .............. 24

CONCLUSION ............................................................................................... 26

CERTIFICATE OF COMPLIANCE....................................................................27

CERTIFICATE OF SERVICE .........................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bev. Ass'n v. Snyder*,
735 F.3d 362 (6th Cir. 2013) ....................7

*Artis v. District of Columbia*,
583 U.S. 71 (2018)....................15

*Bond v. United States*,
572 U.S. 844 (2014)....................4, 5, 16, 17

*Bond v. United States*,
564 U.S. 211 (2011)....................3, 5, 6

*California v. Texas*,
593 U.S. 659 (2021)....................8, 9

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)....................11

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)....................10

*Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*,
126 F.4th 476 (6th Cir. 2025) ....................4

*Gamble v. United States*,
587 U.S. 678 (2019)....................24

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824)....................6, 11, 13

*Gonzales v. Raich*,
545 U.S. 1 (2005)....................5, 6, 11, 12, 22, 24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....................4, 5

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................13

*Health & Hosp. Corp. v. Talevski*,
599 U.S. 166 (2023)....................................................................................9

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*,
740 F. Supp. 3d 509 (N.D. Tex. 2024) ......................................17, 18, 19, 22, 23

*Kidd v. Pearson*,
128 U.S. 1 (1888)......................................................................................11

*Kinsella v. United States*,
361 U.S. 234 (1960)..................................................................................14

*License Tax Cases*,
72 U.S. (5 Wall.) 462 (1867) .....................................................................13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)..................................................................................23

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .......................................................................8

*Martin v. Hunter's Lessee*,
14 U.S. (1 Wheat.) 304 (1816) ...................................................................10

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ..........................................................6, 14, 15, 18

*Medina v. Planned Parenthood South Atlantic*,
606 U.S. ____ (2025)......................................................................9, 10, 20

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932)....................................................................................6

*New York v. United States*,
505 U.S. 144 (1992)....................................................................................5

*NFIB v. Sebelius*,
567 U.S. 519 (2012)..............................................................5, 7, 8, 9, 18, 19, 20

*Printz v. United States*,
521 U.S. 898 (1997)..............................................................................5, 13

*Reid v. Covert*,
354 U.S. 1 (1957) ... 6

*Sabri v. United States*,
541 U.S. 600 (2004) ... 15

*Sackett v. EPA*,
598 U.S. 651 (2023) ... 10, 24

*Seila Law LLC v. Consumer Financial Protection Bureau*,
591 U.S. 197 (2020) ... 23

*Taylor v. United States*,
579 U.S. 301 (2016) ... 20, 26

*Tex. Top Cop Shop, Inc. v. Garland*,
758 F. Supp. 3d 607 (E.D. Tex. 2024) ... 19

*United States v. Allen*,
86 F.4th 295 (6th Cir. 2023) ... 6, 21, 25

*United States v. Comstock*,
560 U.S. 126 (2010) ... 13, 14, 15, 16, 18

*United States v. Darby*,
312 U.S. 100 (1941) ... 25

*United States v. Dewitt*,
76 U.S. (9 Wall.) 41 (1869) ... 13, 18, 19

*United States v. E.C. Knight Co.*,
156 U.S. 1 (1895) ... 5

*United States v. Kebodeaux*,
570 U.S. 387 (2013) ... 8

*United States v. Lopez*,
514 U.S. 549 (1995) ... 7, 11, 12, 22, 23, 24, 26

*United States v. Morrison*,
529 U.S. 598 (2000) ... 7, 8, 22, 23, 26

*United States v. Rife*,
33 F.4th 838 (6th Cir. 2022) ....................................................10, 12, 21, 25, 26

*United States v. Seekins*,
52 F.4th 988 (5th Cir. 2022) ..........................................................................7

*United States Term Limits v. Thornton*,
514 U.S. 779 (1995)............................................................................4, 6

*Wickard v. Filburn*,
317 U.S. 111 (1942)............................................................................24, 25

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015)................................................................................16

**Constitution**

U.S. Const., art. I, § 8, cl. 1 ..........................................................................2, 8, 9

U.S. Const., art. I, § 8, cl. 3 ..........................................................................2, 8

U.S. Const., art. I, § 8, cl. 18 ....................................................................8, 14, 15, 16

U.S. Const. amend. X..........................................................................2, 7

**Statutes**

26 U.S.C. § 5178(a)(1)(B) ..............................................................16, 21, 22, 24

26 U.S.C. § 5601(a) .......................................................................17, 21, 22, 24

26 U.S.C. § 5601(a)(6)..........................................................................17

**Regulations**

27 C.F.R. § 19.51 ..........................................................................17

**Other Authorities**

Albert S. Abel,
*The Commerce Clause in the Constitutional Convention and in Contemporary Comment*,
25 Minn. L. Rev. 432 (1941) ..............................................................12, 13, 24

Antonin Scalia,
*Foreword: The Importance of Structure in Constitutional Interpretation*,
83 Notre Dame L. Rev. 1417 (2008) .................................................................5

Federalist No. 17 (Hamilton) .........................................................................12

Federalist No. 28 (Hamilton) ...........................................................................5

Federalist No. 45 (Madison) .....................................................................7, 12

Federalist No. 51 (Madison) ............................................................................5

Gary Lawson & Patricia Granger,
*The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*,
43 Duke L. J. 267 (1993) ...............................................................................15

Joseph Story,
Commentaries on the Constitution of the United States (1833).........................10

N. Webster's 1828 Dictionary ..................................................................10, 15, 16

Randy E. Barnett,
*New Evidence of the Original Meaning of the Commerce Clause*,
55 Ark. L. Rev. 847 (2003)...........................................................................12

Randy E. Barnett,
*The Original Meaning of the Commerce Clause*,
68 U. Chi. L. Rev. 101 (2001) ......................................................................13

Randy E. Barnett,
*The Original Meaning of the Necessary and Proper Clause*,
6 U. Pa. J. Const. L. 183 (2003) ..........................................................14, 18, 24

Robert G. Natelson,
*What the Constitution Means By "Duties, Imposts, and Excises"—and Taxes*,
66 Case W. Res. 297 (2015) ............................................................................9

S. Johnson, A Dictionary of the English Language (6th ed. 1785) ........................10

Steven Calabresi, Elise Kostial, and Gary Lawson,
*What McCulloch v. Maryland Got Wrong: The Original Meaning of "Necessary" Is Not "Useful," "Convenient," or "Rational"*,
75 Baylor L. Rev. 1, 47 (2023) ........................................................................15

William J. Seidleck,
*Originalism and the General Concurrence: How Originalists Can Accommodate Entrenched Precedents While Reining in Commerce Clause Doctrine*,
3 U. Pa. J. L. & Pub. Affs. 263 (2018) ........................................................11, 12

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Americans for Prosperity Foundation ("AFPF") is a 501(c)(3) nonprofit organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. Some of those ideas include the vertical and horizontal separation of powers, federalism, and constitutionally limited government. As part of this mission, AFPF appears as *amicus curiae* before state and federal courts.

*Amicus* believes that Mr. Ream has Article III standing to challenge the at-home distilling ban for the reasons set forth by Appellant. *Amicus* writes here to elaborate on Mr. Ream's interest in enforcing the Constitution's structural safeguards of individual liberty and why the at-home distilling ban runs counter to federalism and exceeds limits on federal power.

## SUMMARY OF ARGUMENT

In this country, all governmental power must flow from its true source: We the People. Our system of government relies on the consent of the governed, memorialized in the Constitution. To doubly protect individual liberty, our founding

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *amicus curiae* states that no counsel for a party other than AFPF authored this brief in whole or in part, and no counsel or party other than AFPF made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

document not only separates legislative, executive, and judicial power but further splits government power between two separate sovereigns: the States and the federal government. This vertical and horizontal diffusion of power is designed to minimize the risk of tyranny and abuse at either level. The Constitution's structural safeguards of liberty also give wide latitude to state and local governments to experiment and make policy choices that work for their communities.

Federalism is a distinctly American innovation pioneered by the Framers. Under this system of dual sovereignty, the federal government's powers are not unlimited but rather narrow and defined. Thus, while the Constitution grants Congress authority "to regulate Commerce" "among the several States," U.S. Const., art. I, § 8, cl. 3, and "Lay and Collect Taxes," U.S. Const. art. I, § 8, cl. 1, it does not grant the federal government a general police power. The Constitution instead reserves that power to the States. U.S. Const. amend. X.

The at-home distilling ban is an affront to our system of federalism. The statute lacks any pretense of regulating commerce or raising revenue. It not only federally criminalizes wholly *intra*state conduct without any link to *inter*state commerce but prevents taxable activity from occurring.

This ultra vires assertion of federal police power is unconstitutional. Because the at-home distilling ban is a criminal law that raises not a cent in revenue for the U.S. Treasury, it cannot be justified by Congress's taxing power, even as augmented

by the Necessary and Proper Clause. Nor can it be salvaged by Congress's power to regulate interstate commerce. To be sure, the judicially created "substantial effects" test for federal authority under the Interstate Commerce Clause strays from the Constitution's original public meaning to expand the scope of federal power well beyond that which the People agreed to surrender. But even under that lax test, the at-home distilling ban fails to pass constitutional muster.

Notwithstanding the statute's fatal constitutional defects, the district court found that Mr. Ream lacked Article III standing to bring a pre-enforcement challenge, oddly reasoning that he "does not have a constitutional interest in home distilling alcohol." Order, RE33, PageID#285. That was error. And the district court misapprehended the nature of Mr. Ream's constitutional injury.

The Supreme Court has made clear that an "individual, in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines," *Bond v. United States (Bond I)*, 564 U.S. 211, 220 (2011), and "has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable," *id.* at 222. That well describes the at-home distilling ban and Mr. Ream's plight.

But for the challenged provisions making it a federal crime to home-distill spirits, even for personal consumption, Mr. Ream would do so. *See* Ream Decl. ¶¶

11–15, RE20-1, PageID##144–145. A declaration that those provisions exceed constitutional limits on federal power, and are thus void, would redress Mr. Ream's injury by allowing him to home-distill spirits. Therefore, Mr. Ream is entitled to his day in court. That should end the Article III standing analysis. And on the merits, this case is not close: the ban is flatly unconstitutional.

For the foregoing reasons, the judgment below should be reversed.

## ARGUMENT

### I. Our System of Federalism Protects Liberty.

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). It "split[s] the atom of sovereignty" between two spheres of government, *United States Term Limits v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring), and "envisions states as separate sovereigns who are generally afforded discretion to enact a wide range of policy choices," *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 498 (6th Cir. 2025).

Under our federalist system, "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.' The Federal Government, by contrast, has no such authority[.]"[2] *Bond v. United States*

[2] "Where the Constitution is silent about the exercise of a particular power . . . the Federal Government lacks that power and the States enjoy it." *U.S. Term Limits v. Thornton*, 514 U.S. 779, 848 (1995) (Thomas, J., dissenting).

*(Bond II)*, 572 U.S. 844, 854 (2014) (cleaned up); *see Gonzales v. Raich*, 545 U.S. 1, 66 (2005) (Thomas, J., dissenting) (noting "States' traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens"). This means that the "general power of governing" belongs to the States, not the federal government. *See NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012). *Cf. United States v. E.C. Knight Co*., 156 U.S. 1, 12 (1895).

"This separation of the two spheres is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997); *see* Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418–19 (2008). "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (cleaned up). It is "a check on the power of the Federal Government[.]" *NFIB*, 567 U.S. at 536; *see Gregory*, 501 U.S. at 458.

"By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond I*, 564 U.S. at 222. Dual sovereignty provides "a double security [] to the rights of the people." The Federalist No. 51 (Madison). This structural guardrail against tyranny ensures that "[i]f their rights are invaded by either, they can make use of the other as the instrument of redress." Federalist No. 28 (Hamilton).

Federalism also "protect[s] the liberty of the local communities in each State to choose the policies that would govern their local conduct." *United States v. Allen*, 86 F.4th 295, 313 (6th Cir. 2023) (Murphy, J., concurring) (citing *Bond I*, 564 U.S. at 220–22). It "ensur[es] that laws enacted in excess of delegated governmental power cannot direct or control their actions." *Bond I*, 564 U.S. at 222 (citation omitted). And it "promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.'" *Raich*, 545 U.S. at 42 (O'Connor, J., dissenting) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).

## II. Congress's Legislative Power Is Not Plenary But Narrow and Limited.

The federal government "is entirely a creature of the Constitution" and therefore "[i]ts power and authority have no other source."[3] *Reid v. Covert*, 354 U.S. 1, 5–6 (1957) (plurality). Under the Constitution, the federal government is "one of enumerated powers." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). "The enumeration presupposes something not enumerated[.]" *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824). "[T]he Constitution cannot realistically be interpreted

[3] The federal government's "only true source of power" is "the people of the several States[.]" *U.S. Term Limits*, 514 U.S. at 847 (Thomas, J., dissenting).

as granting the Federal Government an unlimited license to regulate." *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000).

To the contrary, the federal government "can claim no powers which are not granted to it by the [C]onstitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326 (1816); *see* U.S. Const. amend. X. Those powers were meant to "be exercised principally on external objects, as war, peace, negotiation, and foreign commerce[.]" Federalist No. 45 (Madison). By contrast, the Constitution reserved to the States "numerous and indefinite" powers that "extend to all the objects" that "concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."[4] *Id*. This federalist structure was created to ensure "a healthy balance of power between the States and the Federal Government [and] reduce the risk of tyranny and abuse from either front." *United States v. Lopez*, 514 U.S. 549, 552 (1995) (cleaned up); *see United States v. Seekins*, 52 F.4th 988, 990 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc).

To exercise power, the federal government "must show that a constitutional grant of power authorizes each of its actions." *NFIB*, 567 U.S. at 535. "Every law

---

[4] At the Founding, "[a] State's power to 'protect the lives, health, and property' of its residents was 'essentially exclusive[.]'" *Am. Bev. Ass'n v. Snyder*, 735 F.3d 362, 377 (6th Cir. 2013) (Sutton, J., concurring) (citation omitted).

enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *Morrison*, 529 U.S. at 607. Without a constitutional grant of authority to Congress, it simply cannot act. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) ("The powers of the legislature are defined, and limited[.]").

"The Constitution sets forth Congress' limited powers in Article I. That Article begins by 'vest[ing]' in Congress '[a]ll legislative Powers herein granted,' and then enumerates those powers in § 8." *United States v. Kebodeaux*, 570 U.S. 387, 409 (2013) (Thomas, J., dissenting). As relevant here, Article I grants Congress authority "to regulate Commerce" "among the several States," U.S. Const., art. I, § 8, cl. 3, and "Lay and Collect Taxes," U.S. Const. art I, § 8, cl. 1. And it grants Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers. U.S. Const. art. I, § 8, cl. 18.

### A. The Taxing Clause Only Empowers Congress to Pass Laws That Raise Revenue.

First, "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *NFIB*, 567 U.S. at 574. This means that "the essential feature of any tax" is that it can directly "produce[] at least some revenue for the Government." *Id.* at 564.

As a matter of first principles, "[t]hat limitation follows from the text of the" Taxing Clause, *California v. Texas*, 593 U.S. 659, 707 (2021) (Alito, J., dissenting), which grants Congress "Power To lay and collect Taxes, Duties, Imposts and

Excises, to pay the Debts and provide for the common Defence and general Welfare[.]"[5] U.S. Const. art. I, § 8, cl. 1. "At the founding, to 'lay' in the relevant sense meant to 'assess; to charge; to impose.' To 'collect' meant to 'gather money or revenue from debtors; to demand and receive.' And a 'tax' was a 'rate or sum of money' assessed on certain persons or property." *Id.* at 707–08 (Alito, J., dissenting) (cleaned up). This provision thus clearly contemplates raising revenue for the public fisc. *See id.* at 707 (Alito, J., dissenting); *see also* Robert G. Natelson, *What the Constitution Means By "Duties, Imposts, and Excises"—and Taxes*, 66 Case W. Res. 297, 350 (2015).

In sum, the Taxing Clause is not a font of free-floating authority to regulate or prohibit private conduct untethered to revenue-raising measures. To the contrary, the Founding generation understood it as "granting only a power to tax."[6] *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 213 (2023) (Thomas, J., dissenting). But that is all. *See NFIB* 567 U.S. at 574. As Justice Story cautioned, if it were otherwise, "the 'enumeration of specific powers' elsewhere in Article I would be rendered largely pointless, and the Nation would trade a limited federal government for 'an

---

[5] In contrast with "other enumerated powers" in Article I, the Taxing Clause "does not expressly endow Congress with the power to regulate conduct." *Medina v. Planned Parenthood South Atlantic*, 606 U.S. ____ (2025) (slip op., 8) (cleaned up).

[6] The General Welfare Clause likewise "confers no independent regulatory power." *Talevski*, 599 U.S. at 209 (Thomas, J., dissenting).

unlimited' one." *Medina*, 606 U.S. at ____ (slip op., 9) (quoting 2 J. Story, Commentaries on the Constitution of the United States §§ 904, 906 (1833)). That would dash the Constitution's system of dual sovereignty and cannot be right.

### B. The Commerce Clause, As Originally Understood, Only Grants Congress Power to Regulate Interstate Trade and Transportation.

The Interstate Commerce "Clause's text, structure, and history all indicate that, at the time of the founding, the term 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *Sackett v. EPA*, 598 U.S. 651, 708 (2023) (Thomas, J., concurring) (cleaned up).

"Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215, 235 (2022) (citations omitted). "The public meaning of 'commerce' at the time of the Constitution's ratification was hardly obscure[.] . . . 'Commerce,' at that time, meant 'trade' or economic 'intercourse,' which consisted of 'exchange of one thing for another,' 'interchange,' or 'traffick.'" *United States v. Rife*, 33 F.4th 838, 842 (6th Cir. 2022) (Kethledge, J.) (citing 1 S. Johnson, A Dictionary of the English Language 422 (6th ed. 1785)); *see* N. Webster's 1828 Dictionary (defining "commerce" as "an interchange or mutual change of goods, wares, productions, or property of any kind, between nations or individuals, either by barter, or by purchase and sale; trade; traffick").

As Chief Justice Marshall put it: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons,* 22 U.S. (9 Wheat.) at 189–90; *see Carter v. Carter Coal Co.,* 298 U.S. 238, 298 (1936) ("[T]he word 'commerce' is the equivalent of the phrase 'intercourse for the purposes of trade,' and includes transportation, purchase, sale, and exchange of commodities between the citizens of the different states."). Likewise, "when Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably." *Lopez*, 514 U.S. at 586 (Thomas, J., concurring).

This "stood in contrast to productive activities like manufacturing and agriculture." *Raich*, 545 U.S. at 58 (Thomas, J., dissenting); *see Lopez*, 514 U.S. at 587 (Thomas, J., concurring) ("Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles."); *Kidd v. Pearson*, 128 U.S. 1, 20 (1888) (contrasting commerce with manufacturing). "[T]he founding generation would not have seen production activities, such as manufacturing, mining, and agriculture, as being part of commerce." William J. Seidleck, *Originalism and the General Concurrence: How Originalists Can*

*Accommodate Entrenched Precedents While Reining in Commerce Clause Doctrine*, 3 U. Pa. J. L. & Pub. Affs. 263, 269 (2018).

"Federalists and Antifederalists alike" "distinguished 'commerce' from manufacturing and agriculture. Commerce itself, then, meant trade and transportation thereof, as opposed to activities preceding those things."[7] *Rife*, 33 F.4th at 842 (citations omitted). "[D]espite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns[.]" *Lopez*, 514 U.S. at 591 (Thomas, J., concurring) (citing Federalist No. 17). "The term 'commerce' commonly meant trade or exchange (and shipping for these purposes) not simply to those involved in the drafting and ratification processes, but also to the general public." *Raich*, 545 U.S. at 59 (Thomas, J., dissenting) (citing Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 Ark. L. Rev. 847, 857–62 (2003)).

---

[7] Given its limited intended scope, the Framers did not view the Commerce Clause as a threat to liberty. James Madison, for example, characterized it as "an addition which few oppose and from which no apprehensions are entertained." Federalist No. 45. Tellingly, no one at the Constitutional Convention cited it "as the basis for independent affirmative regulation by the federal government." Albert Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 471 (1941).

Further, under the original understanding, the Clause empowered Congress to regulate *inter*state (as opposed to *intra*state) trade and transportation. *See United States v. Dewitt*, 76 U.S. (9 Wall.) 41, 43–44 (1869) (describing Commerce Clause "as a virtual denial of any power to interfere with the internal trade and business of the separate States"). That is, "Congress's power under the Interstate Commerce Clause operates only on commerce that involves 'more States than one.'" *Haaland v. Brackeen*, 599 U.S. 255, 323 (2023) (Gorsuch, J., concurring) (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 194); *see License Tax Cases*, 72 U.S. (5 Wall.) 462, 470–71 (1867) ("Congress has no power of regulation nor any direct control" over "internal commerce or domestic trade of the States.").

In sum, the Commerce Clause gives Congress "power to specify rules to govern the manner by which people may exchange or trade goods from one state to another[.]" Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 146 (2001). In other words, "[i]t was a shield against state exactions and no two-edged sword for positive federal attack." Abel, 25 Minn. L. Rev. at 469. But that is all.

### C. The Necessary and Proper Clause Is Not a Free-Standing Source of Federal Power Untethered to Congress's Enumerated Powers.

Justice Scalia colorfully described the Necessary and Proper Clause as the "best hope of those who defend *ultra vires* congressional action[.]" *Printz*, 521 U.S. at 923. But it "does not give Congress *carte blanche*." *United States v. Comstock*,

560 U.S. 126, 158 (2010) (Alito, J., concurring). It "is not itself a grant of power, but a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of § 8 'and all other Powers vested by this Constitution[.]'" *Kinsella v. United States*, 361 U.S. 234, 247 (1960). The "Clause empowers Congress to enact only those laws that 'carr[y] into Execution' one or more of the federal powers enumerated in the Constitution." *Comstock*, 560 U.S. at 159 (Thomas, J., dissenting) (quoting U.S. Const. art. I, § 8, cl. 18). In other words, it is not a free-floating source of federal power and thus cannot save laws that are untethered to any of Congress's enumerated powers.[8]

As Chief Justice Marshall described the Clause's sweep: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. (4 Wheat.) at 421. This means that for a law to fall within the scope of Congress's power under the Necessary and Proper Clause it "must be directed toward . . . the powers expressly delegated to the Federal Government by some provision in the Constitution," and "there must be a necessary and proper fit between

---

[8] Federalists "insisted that the Necessary and Proper Clause was not an additional freestanding grant of power, but merely made explicit what was already implicit in the grant of each enumerated power." Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. Pa. J. Const. L. 183, 185 (2003).

the 'means' (the federal law) and the 'end' (the enumerated power or powers) it is designed to serve." *Comstock*, 560 U.S. at 160 (Thomas, J., dissenting).

As a textual matter, the Clause requires that a law must be *both* "necessary and proper[.]" U.S. Const. art. I, § 8, cl. 18. These are "distinct requirements[.]" Gary Lawson & Patricia Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L. J. 267, 276 (1993). "[T]he word 'necessary' . . . refers to a telic relationship, or fit, between executory laws and valid government ends."[9] *Id.* at 272. "The means Congress selects will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power[.]" *Comstock,* 560 U.S. at 160–61 (Thomas, J., dissenting) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421). "Plainly adapted" connotes "some obvious, simple, and direct relation between the statute and the enumerated power." *Sabri v. United States*, 541 U.S. 600, 613 (2004) (Thomas, J., concurring).

"The word 'proper' was 'used during the founding era to describe the powers of a governmental entity as peculiarly within the province or jurisdiction of that entity.'" *Artis v. District of Columbia*, 583 U.S. 71, 106 (2018) (Gorsuch, J., dissenting) (quoting Lawson & Granger, 43 Duke L. J. at 297); *see* N. Webster's

---

[9] Founding-era "dictionary definitions and the word's etymology" suggest "the best synonyms of 'necessary' are 'needful and proper' or 'congruent and proportional,' not 'useful' and 'convenient.'" Steven Calabresi, Elise Kostial, and Gary Lawson, *What McCulloch v. Maryland Got Wrong: The Original Meaning of "Necessary" Is Not "Useful," "Convenient," or "Rational"*, 75 Baylor L. Rev. 1, 47 (2023).

1828 Dictionary ("Proper" means "1. Peculiar; naturally or essentially belonging to a person or thing; not common."). "To be 'proper,' a law must fall within the peculiar competence of Congress under the Constitution." *Zivotofsky v. Kerry*, 576 U.S. 1, 48 (2015) (Thomas, J., concurring in judgment and dissenting in part). "Our constitutional structure imposes three key limitations on that jurisdiction: It must conform to (1) the allocation of authority within the Federal Government, (2) the allocation of power between the Federal Government and the States, and (3) the protections for retained individual rights under the Constitution." *Id.* (Thomas, J., concurring in judgment and dissenting in part) (citation omitted).

"No law that flattens the principle of state sovereignty, whether or not 'necessary,' can be said to be 'proper.'" *Bond II*, 572 U.S. at 879 (Scalia, J., concurring in judgment). And "no matter how 'necessary' or 'proper' an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers." *Comstock*, 560 U.S. at 161 (Thomas, J., dissenting) (quoting U.S. Const. art. I, § 8, cl. 18). So too here.

## III. The At-Home Distilling Prohibition Exceeds Constitutional Limits on Federal Power.

The statute at issue here imposes a blanket ban on at-home distilling. 26 U.S.C. § 5178(a)(1)(B). It makes it a federal felony to "use[], or possess[] with intent to use, any still, boiler, or other utensil for the purpose of producing distilled spirits,

or aids or assists therein, or causes or procures the same to be done, in any dwelling house" or similar location. 26 U.S.C. § 5601(a)(6). There is no personal-use exception. *See* 27 C.F.R. § 19.51 ("A person may not produce distilled spirits at home for personal use."). "Stills at home for hooch are: Simply. Not. Allowed." *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 525 (N.D. Tex. 2024), *appeal filed*, No. 24-10760 (5th Cir.). Violations carry up to a five-year prison sentence and a $10,000 fine. 26 U.S.C. § 5601(a).

"By its clear terms," the at-home distilling ban thus "regulates local criminal conduct that is subject to the powers reserved to the States." *Bond II*, 572 U.S. at 882 (Thomas, J., concurring in judgment). It reaches wholly intrastate conduct lacking any nexus to interstate commerce without raising one cent of revenue for the U.S. Treasury. This exceeds constitutional limits on federal power.

### A. Congress's Taxing Power Cannot Save the Statute.

The government has argued the at-home distilling ban falls within Congress's taxing power. *See* Def's Mem. ISO Mot. to Dismiss Compl., RE13, PageID##85–89. Not so. Here, "Congress did nothing more than statutorily ferment a crime—without any reference to taxation, exaction, protection of revenue, or sums owed to the government." *Hobby Distillers*, 740 F. Supp. 3d at 525. The challenged provisions "do not raise revenue," *id.* at 524, and "make[] no reference to any mechanism or process that operates to protect revenue," *id.* at 529. Indeed, the at-

home distilling ban *frustrates* the government's interest in raising revenue by preventing taxable activity (production of distilled spirits).[10] "That plasters sections 5601(a)(6) and 5178(a)(1)(B) as 'not a tax.'" *Id.* at 525; *see NFIB,* 567 U.S. at 573.

Nor are these provisions "necessary and proper," U.S. Const. art. I, § 8, cl. 18, "to carry into execution," *McCulloch*, 17 U.S. (4 Wheat.) at 420, Congress's enumerated taxing power because they are not "plainly adapted," *id.* at 421, to execute Congress's power to lay and collect taxes on distilled spirits to raise revenue for the U.S. Treasury. "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Comstock*, 560 U.S. at 150 (Kennedy, J., concurring in the judgment). *But cf.* Barnett, 6 U. Pa. J. Const. L. at 186. Here, the chain is exceedingly weak, if not nonexistent.

*United States v. Dewitt*, 76 U.S. (9 Wall.) 41 (1869), is instructive. In *Dewitt*, the challenged statute provided that "no person shall mix for sale naphtha and illuminating oils, or shall knowingly sell or keep for sale, or offer for sale such mixture, or shall sell or offer for sale oil made from petroleum for illuminating purposes." *Id.* at 42 (quoting 14 Stat. 484). The government argued that the

[10] Tellingly, the statute does not provide would-be at-home distillers any way to operate legally. *See Hobby Distillers*, F. Supp. 3d at 525.

prohibition "was in aid and support of the internal revenue tax imposed on other illuminating oils." *Id.* at 44. The Court rejected that argument because "[t]his consequence is too remote and too uncertain to warrant" the conclusion "that the prohibition is an appropriate and plainly adapted means for carrying into execution the power of laying and collecting taxes," *id.*, and invalidated the statute as beyond the scope of federal power, *id.* at 45.

That reasoning equally applies here. Congress's taxing power simply cannot justify the at-home distilling ban. *Hobby Distillers*, 740 F. Supp. 3d at 530. *Cf. Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 659 (E.D. Tex. 2024) ("[T]hat Congress 'sense[d]' that the CTA would be 'highly useful' in detecting tax fraud and would 'improve' tax administration in general do not render the CTA constitutionally valid."), *appeal filed*, No. 24-40792 (5th Cir.).

If it were otherwise, then there would be no limiting principle that would cabin the ability of the federal government to regulate or prohibit private conduct it could not otherwise reach under the banner of its taxing power. "[A]lthough the breadth of Congress's power to tax is greater than its power to regulate commerce, the taxing power does not give Congress the same degree of control over individual behavior." *NFIB*, 567 U.S. at 573. Unlike the taxing power, for matters properly within Congress's Commerce Clause authority, "the Federal Government can bring its full weight to bear." *Id.* If the criminal prohibition at issue here could be justified as a

necessary and proper exercise of Congress's taxing power it would, in effect, allow the federal government to bootstrap its full Commerce Clause power onto its taxing power, rendering the two coterminous. In that case, the at-home distilling ban would not be proper as it "would work a substantial expansion of federal authority," allowing Congress to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." *Id.* at 560. *Cf. Medina*, 606 U.S. at ____ (slip op., 9).

### B. The Interstate Commerce Power Cannot Justify the At-Home Distilling Ban Under Any Standard.

The government also has attempted to salvage the statute as a proper exercise of Congress's Commerce Clause powers. *See* Def's Mem. ISO Mot. to Dismiss Compl., RE13, PageID##89–92. That argument lacks merit both as an original matter and under current precedent.

#### 1. The At-Home Distilling Ban Is Unconstitutional Under the Original Understanding of the Commerce Clause.

As a matter of first principles, the challenged provisions exceed Congress's power under the Commerce Clause as understood by the Framers. The Clause "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines." *Taylor v. United States*, 579 U.S. 301, 313 (2016) (Thomas, J., dissenting) (cleaned up). That is, it "originally allowed Congress to

regulate both ‘trade’ and the ‘transportation’ of the traded products.” *Allen*, 86 F.4th at 308–09 (Murphy, J., concurring) (quoting *Rife*, 33 F.4th at 842).

26 U.S.C. § 5601(a)(6) and 26 U.S.C. § 5178(a)(1)(B) regulate neither. Because these provisions’ objective has nothing to do with Congress’s enumerated powers under the Interstate Commerce Clause, they also fall outside the scope of Congress’s power under the Necessary and Proper Clause, which is not itself a free-standing grant of legislative power.

**2. The At-Home Distilling Ban Fails the Judicially Created “Substantial Effects” Test.**

Even under the Supreme Court’s modern light-touch Interstate Commerce Clause doctrine, the at-home distilling ban fails to pass constitutional muster.

The Court’s modern jurisprudence—which departs from the Constitution’s original public meaning—authorizes Congress to regulate three categories of interstate commerce: “First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce. . . . Finally, Congress’ commerce authority includes the power to regulate . . . those activities that substantially affect interstate

commerce."[11] *Lopez*, 514 U.S. at 558–59 (citations omitted). The challenged provisions regulate none of those things.

Neither 26 U.S.C. § 5601(a)(6) nor 26 U.S.C. § 5178(a)(1)(B) regulates the channels or instrumentalities of interstate commerce. Thus, if the challenged provisions are to be upheld under current precedent, then they must fall within Congress's authority to regulate "activities that substantially affect interstate commerce." *Morrison*, 529 U.S. at 608–09 (cleaned up). They do not.

The challenged provisions do not reference "commerce," let alone *inter*state commerce. And they contain "no express jurisdictional element which might limit its reach" to entities that "have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. "The statute does not, for instance, prohibit the possession of a still with intent to imbibe *where the still's components travelled in interstate commerce.* Nor does it prohibit the possession of a still with intent to produce beverage alcohol *for distribution in interstate commerce.*" *Hobby Distillers*, 740 F. Supp. 3d at 534. The challenged "provisions are simply 'criminal statute[s] that by [their] terms' have no commerce-clause jurisdictional hook to bring the behavior Congress seeks to regulate within its authority." *Id.* (quoting *Lopez*, 514 U.S. at 561).

[11] "[A]ctivities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone." *Raich*, 545 U.S. at 34 (Scalia, J., concurring).

That is a fatal constitutional defect. The absence of a jurisdictional hook or even any reference to commerce renders the statute facially invalid even under current precedent. *See, e.g.*, *Morrison*, 529 U.S. at 613 (invalidating statute that "contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"); *Lopez*, 514 U.S. at 561 (invalidating criminal statute that "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce").

Nor can this Court solve the statute's constitutional problem by judicially editing it. "Beginning and ending with the text, neither of these provisions connect the prohibited behavior to interstate commerce. And no reasonable construction of the statutes can insert language that does." *Hobby Distillers*, 740 F. Supp. 3d at 534. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up). Nor can constitutional avoidance rescue Congress's constitutionally flawed handiwork. *See Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 230 (2020).

And because the statute's objectives are untethered to Congress's Interstate Commerce Clause powers, the Necessary and Proper Clause likewise cannot support its intrusions on individual liberty and State sovereignty, as that Clause is not a

freestanding grant of federal power. *See Raich*, 545 U.S. at 34 (Scalia, J., concurring); Barnett, 6 U. Pa. J. Const. L. at 185; *see also Lopez,* 514 U.S. at 588–89 (Thomas, J., concurring).

In sum, 26 U.S.C. §§ 5601(a)(6) and 5178(a)(1)(B) exceed constitutional limits on federal authority. "By legislating beyond its limited powers Congress has taken from the People authority that they never gave." *Gamble v. United States*, 587 U.S. 678, 710 n.1 (2019) (Thomas, J., concurring).

## IV. The "Substantial Effects" Test Has No Basis In the Constitution.

"[T]he [Supreme] Court's Commerce Clause jurisprudence has significantly departed from the original meaning of the Constitution." *Sackett*, 598 U.S. at 708 (Thomas, J., concurring). While the People, through the Constitution, gave Congress "a mild, modest little power" to regulate domestic commerce among the States, "[t]he commerce power that the courts have given Congress is a rather formidable creation of indefinite extent which federalizes, so to speak, whatever it touches." Abel, 25 Minn. L. Rev. at 481.

"In the New Deal era, as is well known, th[e Supreme] Court adopted a greatly expanded conception of Congress' commerce authority[.]"[12] *Sackett*, 598 U.S. at 696 (Thomas, J., concurring) (citing *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942);

[12] Amicus respectfully believes that line of precedent was wrongly decided and should be overruled.

*United States v. Darby*, 312 U.S. 100, 119 (1941)). "The [Supreme] Court developed th[e] substantial-effects test in the 1930s to uphold federal laws designed to combat the Great Depression." *Allen*, 86 F.4th at 309 (Murphy, J., concurring) (citations omitted). This jurisprudential development "came during a period of national exigencies peculiar to interstate commerce—namely a national Depression ever since known as such, and (in *Wickard v. Filburn*, 317 U.S. 111 (1942)) the beginnings of a nationwide war effort." *Rife*, 33 F.4th at 844.

"By departing from" the Clause's "limited meaning," this line of precedent "ha[s] licensed federal regulatory schemes that would have been unthinkable to the Constitution's Framers and ratifiers." *Sackett*, 598 U.S. at 708–09 (Thomas, J., concurring) (cleaned up); *see, e.g.*, *Raich*, 545 U.S. 1 (local cultivation of marijuana); *Wickard*, 317 U.S. 111 (local wheat farming). "[T]he very notion of a 'substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with th[e Supreme] Court's early Commerce Clause cases." *Morrison*, 529 U.S. at 627 (Thomas, J., concurring); *see Lopez*, 514 U.S. at 599 (Thomas, J., concurring) (noting test's "recent vintage"). And this "revisionist structure that, 80 years ago, the Supreme Court added to the Interstate

Commerce Clause" "has come to overshadow the original structure to which it was attached[.]" *Rife*, 33 F.4th at 843, 844.

Even the Supreme Court's more modern Commerce Clause "precedents emphasize that '[t]he Constitution requires a distinction between what is truly national and what is truly local.' The substantial-effects approach is at war with that principle." *Taylor*, 579 U.S. at 319 (Thomas, J., dissenting) (quoting *Morrison*, 529 U.S. at 617–18). This holds particularly true for the test's "aggregation principle," which "has no stopping point." *Lopez*, 514 U.S. at 600 (Thomas, J., concurring).

This judicial aggrandizement of the Commerce Clause's original public meaning should not be further expanded to take another step toward granting the federal government the general police power the Constitution reserves to the States. U.S. Const. amend X; *see Lopez*, 514 U.S. at 599–602 (Thomas, J., concurring).

## CONCLUSION

For these reasons, this Court should reverse the judgment below.

Respectfully submitted,

/s/ Michael Pepson
Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains 6,223 words. This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Times New Roman 14-point font.

/s/ Michael Pepson
Michael Pepson

Dated: July 1, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2025, I electronically filed the above Brief of Amicus Curiae Americans for Prosperity Foundation in Support of Plaintiffs-Appellees/Cross-Appellants with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.

/s/ Michael Pepson
Michael Pepson

Dated: July 1, 2025