**No. 25-3259**

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

John Ream,
*Plaintiff-Appellant*,

v.

U.S Department of the Treasury, Secretary Scott Bessent,
Alcohol and Tobacco Tax and Trade Bureau,
Administrator Mary G. Ryan,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Civil Action No. 2:24-cv-00364-EAS-CMV

## BRIEF OF *AMICUS CURIAE* THE CENTER FOR INDIVIDUAL RIGHTS IN SUPPORT OF APPELLANT AND REVERSAL


Michael A. Petrino
Caleb Kruckenberg
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW
Suite 625
Washington, DC 20036
(202) 833-8400
petrino@cir-usa.org

*Counsel for* Amicus Curiae
*Center for Individual Rights*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3259 Case Name: Ream v. Department of the Treasury

Name of counsel: Michael A. Petrino

Pursuant to 6th Cir. R. 26.1, Amicus Curiae Center for Individual Rights
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

| |
|---|
| No. |

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

| |
|---|
| None known. |

CERTIFICATE OF SERVICE

I certify that on July 1, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Michael A. Petrino

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....... i

TABLE OF AUTHORITIES ....... ii

INTEREST OF *AMICUS CURIAE* ....... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....... 3

ARGUMENT ....... 6

I. The District Court Misapplied A Standard Developed For Certain First Amendment Pre-Enforcement Challenges ....... 6

A. The Supreme Court Has Consistently Found Standing For Pre-Enforcement Challenges. ....... 7

B. The Supreme Court Created A Specific Standing Inquiry For Vagueness And Overbreadth Pre-Enforcement Challenges In The First Amendment Context ....... 10

1. Overbreadth And Vagueness Challenges In The First Amendment Context Permit More Expansive Facial Challenges ....... 11

2. A Three-Part Test Governs "Injury-In-Fact" For Overbreadth And Vagueness Challenges In The First Amendment Context ....... 13

C. The *Driehaus* Test Is A Poor Fit For This Enumerated-Powers Challenge, And The District Court Missapplied That Test Here ....... 18

II. The Judiciary Plays A Critical Role Protecting The Structural Constitution Through Cases Like This One, And This Court Should Address Ream's Meritorious Claims. ....... 26

A. Courts Are The Only Institutional Check To Preserve Federalism, Which Helps Protect Individual Rights ....... 27

B. Ream Has Shown That The Federal Prohibition On Home Distilling Exceeds Congress's Commerce Clause Power ....... 31

CONCLUSION ....... 34

CERTIFICATE OF COMPLIANCE ....... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) ........................................ 8

*Babbitt v. Farm Workers Nat. Union*,
442 U.S. 289 (1979) ........................................ *passim*

*Berry v. Schmitt*,
688 F.3d 290 (6th Cir. 2012) ........................................ 24

*Bond v. United States*,
564 U.S. 211 (2011) ........................................ 31

*Carman v. Yellen*,
112 F.4th 386 (6th Cir. 2024) ........................................ *passim*

*Christian Healthcare Centers, Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) ........................................ 26

*Doe v. Bolton*,
410 U.S. 179 (1973) ........................................ 16

*Friends of George's, Inc. v. Mulroy*,
108 F.4th 431 (6th Cir. 2024) ........................................ 19

*Gonzales v. Raich*,
545 U.S. 1 (2005) ........................................ 32

*Granholm v. Heald*,
544 U.S. 460 (2005) ........................................ 10

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ........................................ 28, 29

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*,
740 F. Supp. 3d 509 (N.D. Tex. 2024) ........................................ 22, 33, 34

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........................................ 14

*Kentucky v. Yellen*,
54 F.4th 325, 336 (6th Cir. 2022) ........................................ 22, 23

*Kiser v. Reitz*,
765 F.3d 601 (6th Cir. 2014)....24

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999)....21

*Laird v. Tatum*,
408 U.S. 1 (1972)....13

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 689 (1949)....7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, (1992)....13

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)....7

*McCulloch v. Maryland*,
4 Wheat. 316 (1819)....32

*McDonald v. City of Chicago, Illinois*,
561 U.S. 742 (2010)....10

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016)....24, 25

*MedImmune, Inc. v. Genetech, Inc.*,
549 U.S. 118 (2007)....8, 22

*Moody v. NetChoice, LLC*,
603 U.S. 723 (2024)....11, 12

*Morrison v. Bd. of Educ. of Boyd Cnty.*,
521 F.3d 602 (6th Cir. 2008)....24

*Mosley v. Kohl's Dep't Stores, Inc.*,
942 F.3d 752 (6th Cir. 2019)....23

*Nevada v. Hall*, 440 U.S. 410 (1979), *overruled by Franchise Tax Bd. of California v. Hyatt*,
587 U.S. 230 (2019)....30

*New York Times v. Sullivan*,
376 U.S. 254 (1964)....15

*New York v. Ferber*,
458 U.S. 747 (1982) .......... 12

*New York v. United States*,
505 U.S. 144 (1992) .......... 28

*NFIB v. Sebelius*,
567 U.S. 519, 533–34 (2012) .......... 32

*Online Merchants Guild v. Cameron*,
995 F.3d 540 (6th Cir. 2021), *abrogation on other grounds recognized by Tenn. Conf. of Nat'l Ass'n for Advancement of Colored People v. Lee*,
139 F.4th 557 (6th Cir. 2025) .......... 21

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*,
769 F.3d 447 (6th Cir. 2014) .......... 24

*Printz v. United States*,
521 U.S. 898 (1997) .......... 28

*Russell v. Lundergan-Grimes*,
784 F.3d 1037 (6th Cir. 2015) .......... 24

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) .......... 26

*Steffel v. Thompson*,
415 U.S. 452 (1974) .......... 14

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... *passim*

*Terrace v. Thompson*,
263 U.S. 197 (1923) .......... 8, 9

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 12

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 28, 29

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 1, 27

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 11

*United States v. Williams*,
553 U.S. 285 (2008) .......... 11

*Virginia v. American Booksellers Assn. Inc.*,
484 U.S. 383 (1988) .......... 14

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .......... 12

*Wickard v. Filburn*,
317 U.S. 111 (1942) .......... 33

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 18

**Constitutional Provisions**

U.S. Const., art. III, § 2 .......... 7, 9, 14, 21

**Other Authorities**

Gillian E. Metzger, *Facial Challenges and Federalism*,
105 Colum. L. Rev. 873 (2005) .......... 12

Michael C. Dorf, *Facial Challenges to State and Federal Statutes*,
46 Stan. L. Rev. 236 (1994) .......... 12

Michael S. Greve, *The Upside-Down Constitution* (2012) .......... 29

Remarks of the Hon. Clarence Thomas, *Why Federalism Matters*,
48 Drake L. Rev. 231, (2000). .......... 31

*The Federalist* No. 39 (James Madison)
(George W. Carey & James McClellan eds., 2001). .......... 27, 31

*The Federalist* No. 45 (James Madison)
(George W. Carey & James McClellan eds., 2001) .......... 28

*The Federalist* No. 48 (James Madison)
(George W. Carey & James McClellan eds., 2001) .......... 30

*The Federalist* No. 51 (James Madison)
(George W. Carey & James McClellan eds., 2001) .......... 27

*The Federalist* No. 78 (Alexander Hamilton)
(George W. Carey & James McClellan eds., 2001) .......... 2

## INTEREST OF *AMICUS CURIAE*[1]

The Center for Individual Rights (CIR) is a nonprofit, public interest-law firm dedicated to defending individual rights essential to a free and flourishing society. CIR recognizes that protecting individual rights requires maintaining the constitutionally defined roles of our state and federal governments. Through its Project to Restore Competitive Federalism, CIR identifies and develops significant cases aimed at strengthening the Framers' intended federal structure—one in which competition between state and national governments, as well as between different states, serves as a vital safeguard for individual rights. CIR has a proven track record in this area, successfully representing the prevailing parties in *United States v. Morrison*, 529 U.S. 598 (2000), which remains the Supreme Court's most significant post-New-Deal case limiting Congress's enumerated powers.

CIR often represents plaintiffs in pre-enforcement challenges, like this one, where individuals seek to stop government overreach before it

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, other than *amicus curiae* or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

causes harm. Because pre-enforcement challenges are essential for preventing violations of individual rights, CIR has a strong interest in ensuring that federal courts properly conceive and apply Article III standing doctrines. When courts correctly apply standing requirements, they preserve the Judiciary's constitutional role as a check on government power, serving as "bulwarks of a limited Constitution against legislative encroachments." *The Federalist* No. 78, at 405 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). This role is especially critical in federalism cases like this one addressing the limits of the federal government's enumerated powers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Mr. Ream seeks to distill liquor at his home—conduct that is undisputedly a federal crime. Rather than violate a federal statute, he seeks a declaratory judgment that the statute exceeds Congress's enumerated powers under the Commerce Clause and the taxing power. Ream has standing to bring this claim because: (i) all parties agree that Ream's intended conduct would violate the statute; (ii) Ream has taken concrete steps toward his goal while stopping short of violating the statute; and (iii) the government has maintained the threat of prosecution despite ample opportunity to disavow it. Under straightforward standing principles and governing caselaw, Article III jurisdiction exists for Ream's enumerated-powers challenge to an unambiguous statute.

Nevertheless, the district court erred by reaching the opposite conclusion. The court applied a standard developed for a specific type of pre-enforcement challenge in the First Amendment context, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), to address whether a plaintiff alleging that an unclear statute "chills" speech has shown a likely future "injury in fact." The district court woodenly applied that three-part standard in a way that obscured Ream's present and likely future injury.

That was error. The Supreme Court has long held that plaintiffs may bring pre-enforcement challenges without risking prosecution. (Part I.A.) For pre-enforcement challenges to vague and overbroad statutes in the context of the First Amendment, the Court importantly permits vital "facial" challenges that can sometimes push the boundaries of Article III standing. (Part I.B.1.) To more clearly identify those boundaries, the Court has developed a three-part inquiry to determine whether an alleged "chilling effect" is a likely future "injury in fact" to satisfy Article III standing. (Part I.B.2.)

The district court misapplied that inquiry here. The case the district court cited, *Carman v. Yellen*, 112 F.4th 386 (6th Cir. 2024), only applied the three-part standard to a vagueness claim and, without applying that standard, found standing existed for an enumerated-powers claim like the one here. Per *Carman*, Ream also has standing.

Additionally, the district court's erroneous application of the three-part standing inquiry highlights the inquiry's poor fit here: (i) the district court incorrectly held that Ream's case did not present a constitutional interest, even though this Court has held that engaging in commercial activity is sufficient; (ii) the court applied an arbitrary standard not

supported by governing law, or the sole out-of-circuit district court opinion cited, to conclude incorrectly that Ream must take futile and wasteful acts to show his intent to distill spirits; and (iii) the district court held that there was no substantial likelihood of enforcement, even though Ream's proposed conduct would clearly violate a statute that the government has not disavowed enforcing. (Part I.C.)

Once the Court has corrected the district court's standing analysis, the Court should remand this case with instructions to grant Ream's motion for summary judgment on his meritorious claims. Preserving the limits of Congress's enumerated powers protects the Constitution's division of power between the national government and the states, which is critical to protecting individual rights and promoting the welfare of the people. Judicial review is the primary constitutional means intended to preserve that federal structure, and this enumerated-powers lawsuit is at the heart of that effort. (Part II.A.) Ream has shown that the home-distilling prohibition, which does not have substantial effects on a

comprehensive national regulation, exceeds Congress's authority under the Commerce Clause.[2] Indeed, a district court in Texas agrees. (Part II.B.)

## ARGUMENT

### I. The District Court Misapplied A Standard Developed For Certain First Amendment Pre-Enforcement Challenges.

The district court erred in misapplying three elements to the "injury-in-fact" element of standing: (i) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (ii) "future conduct [that] is arguably proscribed by the statute," (iii) a "substantial" "threat of future enforcement." *Driehaus*, 573 U.S. at 161, 162, 164. The Supreme Court developed that standard in cases addressing pre-enforcement vagueness and overbreadth challenges in the First Amendment context where plaintiffs alleged that a law chilled their speech. But the concerns present in those specific contexts—unclear statutes, potentially indeterminate speech, and hypothetical applications to absent parties—are not present here. Where, as here, a plaintiff challenges a clear statute

[2] *Amicus* agrees with Ream's other merits arguments but writes here to emphasize the importance of the Commerce Clause claim.

because of a desire to engage in proscribed conduct, and the government refuses to waive prosecution, Article III standing exists.

### A. The Supreme Court Has Consistently Found Standing For Pre-Enforcement Challenges.

Starting with well-known first principles, federal courts have jurisdiction over "cases" and "controversies" "arising under th[e] Constitution," U.S. Const., art. III, § 2, and they have the power, in the context of a case or controversy, to invalidate laws that are contrary to the Constitution, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Judicial review of a statute's constitutionality is a necessary consequence of the "judicial duty" to "say what the law is" and "apply the rule to particular cases[.]" *Id.* at 177, 178. In this vein, federal courts have long exercised jurisdiction over equitable "suits for specific relief against officers of the sovereign," like when "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682, 689, 690 (1949). In those cases, "a restraint may be obtained against the conduct of Government officials." *Id.* at 690 (citation omitted).

The Supreme Court has repeatedly held that suits to enjoin unconstitutional statutes can present an Article III case or controversy even

where the government has not yet enforced the statute against the plaintiff. "[W]here threatened action by *government* is concerned, *we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat*—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128–29 (2007) (second emphasis added). Finding standing exists, the Supreme Court in *MedImmune* surveyed four pre-enforcement cases, and explained that, "[i]n each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do …. That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *Id.* at 129. Indeed, "the very purpose of the Declaratory Judgment Act" was to "ameliorate" "[t]he dilemma posed by that coercion." *Id.* (citing and quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)).[3]

One of those cases discussed, *Terrace v. Thompson*, 263 U.S. 197 (1923), underscores the Supreme Court's long-standing history of pre-

[3] Although the district court applied *Driehaus* to find that standing does not exist, *Driehaus* acknowledges the importance of pre-enforcement review, and a unanimous Supreme Court found standing existed there. 573 U.S. at 158–61, 168.

enforcement review. There, Washington state's constitution precluded "aliens" from owning or leasing land. Conveying land in violation of the provision was a misdemeanor, and the land would be forfeited to the state. *Id.* at 212–13. The plaintiffs owned a farm, which they sought to lease to a prospective tenant, an "alien." They believed the provision violated the U.S. Constitution, but did not wish to face the "drastic" penalties. *Id.* Washington argued that the plaintiffs did not have standing and needed to raise the arguments as a defense to criminal prosecution or a forfeiture proceeding. *Id.* at 214. The Supreme Court disagreed, finding standing exists because "[t]he state act purports to operate directly upon the consummation of the proposed transaction between them, and the threat and purpose of the Attorney General [of Washington] to enforce the punishments and forfeiture prescribed prevents each from dealing with the other." *Id.* at 216. Per *Terrace*, if a plaintiff has an intent to engage in a specific action, contrary to a specific provision, and the government has not forsworn enforcement, Article III standing exists for the plaintiff's challenge.

Since then, the Supreme Court has reviewed the constitutionality of laws in a pre-enforcement posture, and despite the independent

obligation to examine standing, the Supreme Court often does not even question whether standing exists. For example, there was no discussion of standing in *Granholm v. Heald*, 544 U.S. 460, 467–68, 472 (2005), where out-of-state wineries successfully challenged, under the Commerce Clause, two states' laws prohibiting them from shipping wine to customers in those states, without first violating those laws. And in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 750 (2010), "residents who would like to keep handguns in their homes for self-defense" challenged Chicago's firearms laws without the Supreme Court questioning their standing to bring the challenge.

### B. The Supreme Court Created A Specific Standing Inquiry For Vagueness And Overbreadth Pre-Enforcement Challenges In The First Amendment Context.

The cases above present examples of pre-enforcement challenges to reasonably clear statutes, but federal courts often confront challenges to statutes *because* they are unclear. The Supreme Court has importantly been willing to exercise broader jurisdiction to hear vagueness or overbreadth challenges in the First Amendment context because of the chilling effect these restrictions have on speech. And these specific challenges generate powerful relief. "Although ordinarily a plaintiff who

engages in some conduct that is clearly proscribed cannot complain of the *vagueness* of the law as applied to the conduct of others, *we have relaxed that requirement in the First Amendment context*, permitting plaintiffs to argue that a statute is *overbroad* because it is unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008) (emphasis added).

The Supreme Court has wrestled at the margins with how to cabin these doctrines—first, a description of why the Supreme Court cabined them and, second, the three-part inquiry adopted.

### 1. Overbreadth And Vagueness Challenges In The First Amendment Context Permit More Expansive Facial Challenges.

Facial overbreadth and vagueness challenges in the First Amendment context can be more powerful than facial challenges in other contexts. An ordinary facial challenge is often said to require a plaintiff to "establish that no set of circumstances exists under which the law would be valid." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Setting aside whether *Salerno* is the actual or correct standard for a typical facial challenge,[4]

---

[4] "[S]ome members of the Court have criticized the *Salerno* formulation …." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442,

"[i]n First Amendment cases, however, this Court has lowered that very high bar." *Id.* In the First Amendment context, "[t]he question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (cleaned up and citation omitted).

These doctrines provide critical protection for First Amendment rights where plaintiffs are rightly concerned that vague, overbroad laws will chill speech. But they are considered "strong medicine" to be employed only "as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982). That is because they permit "a court to hold a statute *facially* unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully *applied*." *United States v. Hansen*, 599 U.S. 762, 769 (2023) (emphasis added). Before addressing such a powerful claim, courts want to ensure that standing exists because "[a]llegations of a subjective 'chill' are not an adequate

---

449 (2008); *see also* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 236, 239 (1994) ("If *Salerno* really set forth the governing standard, however, litigants would rarely bring facial challenges."); Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 880 (2005) ("The distinction between facial and as-applied challenges is more illusory than the ready familiarity of the terms suggests.").

substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

Against that backdrop, the Supreme Court adopted specific standing requirements to address whether a future "injury in fact" is likely to occur for overbreadth and vagueness challenges in the First Amendment context.

### 2. A Three-Part Test Governs "Injury-In-Fact" For Overbreadth And Vagueness Challenges In The First Amendment Context.

Standing requires (i) an injury in fact, (ii) fairly traceable to the challenged conduct of the defendant, (iii) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). For pre-enforcement vagueness and overbreadth cases in the First Amendment context, where both a statute's scope and the plaintiff's potential conduct can be unclear, the Supreme Court has applied specific requirements to the injury-in-fact element of standing—best crystallized in *Driehaus*.

There, plaintiffs brought "facial objections" to an Ohio statute that broadly prohibited "false statements" during political primaries and elections. *Driehaus*, 573 U.S. at 152, 155 n.3. They argued the statute "chilled

and burdened" protected, as well as unprotected, speech and that they intended, in the future, to engage in potentially proscribed speech. *Id.* at 155–56. This Court held the challenge was not ripe because plaintiffs had not shown "an imminent threat of future prosecution." *Id.* at 156.

The Supreme Court unanimously reversed. The Court first surveyed four previous Supreme Court cases—all of them First Amendment challenges for overbreadth, vagueness, or both—and identified a three-part test for identifying an Article III injury in fact. *Id.* at 158–161.[5] Applying that test, the Court held the plaintiffs had shown an injury in fact because: (i) plaintiffs "pleaded specific statements they intend to make in future election cycles," *id.* at 161, (ii) the "intended future conduct is 'arguably ... proscribed by [the] statute' they wish to challenge," *id.* at 162 (quoting *Babbitt v. Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)), and (iii) "the threat of future enforcement of the false statement statute is substantial," *id.* at 164.

[5] Discussing *Steffel v. Thompson*, 415 U.S. 452 (1974); *Babbitt v. Farm Workers Nat. Union*, 442 U.S. 289 (1979); *Virginia v. American Booksellers Assn. Inc.*, 484 U.S. 383 (1988); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

*Driehaus* relied most heavily on *Babbitt*. That case presented, in relevant part, a challenge to an allegedly vague and overbroad state statute making it an unfair labor practice, and also a crime, to encourage consumers to boycott an "agricultural product by the use of dishonest, untruthful and deceptive publicity." *Babbitt*, 442 U.S. at 301. The facial challenge argued that the statute "unconstitutionally penalizes inaccuracies inadvertently uttered in the course of consumer appeals," and while the challengers "do not plan to propagate untruths, they contend—as we have observed—that 'erroneous statement is inevitable in free debate.'" *Id.* at 301 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964)).

The Supreme Court found that the plaintiffs had standing to challenge the statute where (i) the provision challenged "on its face" prohibited the conduct at issue or "arguably prohibited" the conduct, (ii) the plaintiffs "allege an intention" to engage in the conduct, and (iii) although the statute has *never been enforced*, "the State has not disavowed any intention of invoking the criminal penalty provision …." *Id.* at 302–03.

The three-part test emerging from both cases is specifically calibrated for pre-enforcement overbreadth and vagueness cases in the First

Amendment context, where the Court wishes to ensure allegations about chilled speech are a potential future injury in fact.

***First***, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Dreihaus*, 573 U.S. at 161. What it means for conduct to be "affected with a constitutional interest" is not self-evident. The source is a long sentence in *Babbitt* that ends with a quotation from *Doe v. Bolton*, 410 U.S. 179, 188 (1973). *Doe* does not explain, state, or apply the concept, nor do subsequent Supreme Court cases. But in *Babbitt*'s context, this requirement is best understood to assess whether any protected *speech* is arguably implicated. If not, the Court must find no First Amendment injury in fact and thus no standing.

***Second***, the plaintiff must have an intent to engage in a course of conduct that is "arguably … proscribed by [the] statute." *Driehaus*, 573 U.S. at 162 (quoting *Babbitt*, 442 U.S. at 298). This is a low bar. In *Driehaus* standing existed where the "false statement law sweeps broadly" and plaintiffs "alleged an intent to make statements concerning the voting record of a candidate or public official …." *Id.* (cleaned up). The plaintiffs there did not even allege an intent to make *false* statements,

merely statements that arguably fell within the broad statute criminalizing false statements. So too in *Babbitt*, where plaintiffs had standing because they "have previously engaged[] and will in the future engage" in labor campaigns and "desire to engage … in consumer publicity campaigns prohibited by the Act." 442 U.S. at 303. The concern here, again, is identifying with reasonable specificity the speech at issue where a statute's scope is unclear.

***Third***, there must be a "substantial" "threat of future enforcement." *Driehaus*, 573 U.S. at 163. That threat of enforcement was substantial in *Driehaus*, where the Ohio statute permitted "any person" to file a complaint, expanding "the universe of potential complainants." *Id.* at 164. The threat in *Babbitt* was less obvious, yet the plaintiffs still had standing even though the provision "has not yet been applied and may never be applied" in unconstitutional ways. 442 U.S. at 302. The Court relied on the fact that "the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practice" and such a construction remained possible. *Id.*

This complements the two prior elements by focusing on—*i.e.*, if (i) there is protected speech (ii) that is proscribed by law—whether any

authority is likely to enforce the law at issue against that particular speech. This makes sense when a plaintiff is challenging a statute, "on its face," "[w]here a statute does not directly abridge free speech, but … tends to have the incidental effect of inhibiting First Amendment rights," *i.e.*, a "chilling effect." *Younger v. Harris*, 401 U.S. 37, 51–52 (1971). In "suits of this kind," where both the contours of chilled speech and an imprecisely worded statute are unclear, "the relative remoteness of the controversy … and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes" can contribute to a "case that is wholly unsatisfactory for deciding constitutional questions." *Id.* at 53.

In sum, this specific injury-in-fact standing inquiry is purpose-built for overbreadth and vagueness claims in the First Amendment context and not intended for ready use in other pre-enforcement challenges.

### C. The *Driehaus* Test Is A Poor Fit For This Enumerated-Powers Challenge, And The District Court Missapplied That Test Here.

Unfortunately, the district court woodenly applied the *Driehaus* factors to this case, even though it does not present any overbreadth or vagueness issues in a First Amendment context. Relying on *Carman v.*

*Yellen*, 112 F.4th 386, 400 (6th Cir. 2024), the district court asserted, "[i]n the pre-enforcement context, the Sixth Circuit imposes additional requirements to ensure that an injury is imminent." Order, RE 33, PageID #283–84 (citing *Driehaus*, 573 at 160–63, and *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024) (addressing a facial First Amendment challenge alleging chilled speech)).

This misapprehends *Carman*. There, this Court parsed through "five distinct constitutional attacks" against a federal statute and applied the *Driehaus* three-part test only to those claims that concerned a "preenforcement-facial-vagueness challenge." *Carman*, 112 F.4th at 396, 400, 401–02. Because "there is considerable uncertainty over whether any of plaintiffs' alleged vagueness issues will come to pass," *that* claim was unripe. *Id.* at 402. The plaintiff nonetheless had standing for "theories … that require no further factual development and that appear to raise only legal issues stemming from *the face of the statute*." *Id.* at 407 (emphasis added). In other words, *Carman* holds (i) that standing exists where a plaintiff challenges a clear statute, and (ii) the *Driehaus* standard does not automatically apply to all pre-enforcement challenges.

Moreover, *Carman* affirmatively *supports* finding standing here. *Carman* found "clearly ripe" a claim that a statute requiring transactions of "any digital asset" valued at greater than $10,000 to be reported to the U.S. Treasury Department was "not necessary or proper to carrying out [Congress's] taxing power." *Id.* at 405. This Court reasoned that "[t]he enumerated-powers claim presents an exceedingly simple, pure legal issue: either Congress exceeded the powers given to it by the Constitution or it did not.... [I]t was ripe the moment Congress passed the law." *Id.* This was true "even if we do not know the precise contours of how [the statute] will be implemented, what transactions it will actually cover, and how many of plaintiffs' transactions will be at issue." *Id.* at 404. This holding from *Carman* alone justifies reversing the district court.

What is more, errors in the district court's three-factor analysis underscore why a wrote application of the *Driehaus* injury-in-fact test is a poor fit here.

***First***, the district court concluded that Ream has not shown that home distilling is conduct "arguably affected with a constitutional interest." Order, RE 33, PageID #285–87. As contrary examples, the district court cited "two examples in the First Amendment context." *Id.* at PageID

#285. That these First Amendment examples were readily at hand indicates that this factor fits comfortably only in that context—where its purpose is to ensure that the *speech* at issue is constitutionally protected.

In structural constitutional challenges or in equal protection challenges, the plaintiff's conduct often does not *itself* have heightened constitutional protection. Yet those challenges to government conduct are ripe or otherwise justiciable under Article III. *See, e.g.*, *Carman,* 112 F.4th at 405.[6] For example, this Court in *Online Merchants Guild v. Cameron*, 995 F.3d 540, 549 (6th Cir. 2021), *abrogation on other grounds recognized by Tenn. Conf. of Nat'l Ass'n for Advancement of Colored People v. Lee*, 139 F.4th 557, 563 (6th Cir. 2025), found that "engag[ing] in commercial activity" satisfied this element, and in *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022), held that "federalism principles" are a sufficient constitutional interest. Indeed, the Supreme Court found standing existed in *MedImmune*, which concerned the payment of patent licensing fees. 549 U.S. at 122.

---

[6] *See also Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 403–06 (6th Cir. 1999) (finding standing in an equal protection challenge to a state licensing statute).

***Second***, the district court held that, to show "a serious intent to engage in conduct proscribed by the challenged statutes," Ream must be "'no more than one overt act away from criminal liability under the challenged statutes.'" Order, RE 33, PageID #288 (quoting *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 519 (N.D. Tex. 2024)).

The one-overt-act-away standard has no basis in law or logic. The standard is not present anywhere in Supreme Court or Sixth Circuit caselaw, and the district court's opinion cites none. *Hobby Distillers* does not even apply the standard. After reviewing the facts, the district court there concluded that the plaintiffs were "no more than one overt act away from criminal liability," which was sufficient, but not necessary, to "show[] a serious intent to engage in proscribed conduct." 740 F. Supp. 3d at 719. The court did not hold that plaintiffs were *required to be* no more than one overt act away.

Additionally, the district court's crabbed analysis focuses improperly on "intent." The second *Driehaus* factor is whether the "intended future conduct is arguably proscribed by the statute [plaintiffs] wish to challenge." 573 U.S. at 161 (cleaned up). The focus is on whether the

intended conduct is *proscribed by statute*, not whether a plaintiff truly intends the conduct. Here, there is no dispute that Ream's intended conduct is proscribed. And in any event, plausibly alleging an intent to engage in certain conduct is sufficient. *See Driehaus*, 573 U.S. at 161–62; *Kentucky*, 54 F.4th at 336 (finding standing based on allegation of intent to accept federal funds and enact tax cuts); *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 759 (6th Cir. 2019) (finding standing based on allegation of intent to return).

The one-overt-act-away standard also lacks any limiting principle. One could always theorize additional steps, however trivial, that a plaintiff *could* take before violating a statute. And, as if to underscore the standard's critical flaw, the district court theorized an additional step—purchasing a still—that would have violated the statute, not merely inched Ream closer to unlawful conduct. Order, RE 33, pageID #288–89.

In essence, the district court ruled that Ream must engage in futile and wasteful acts to have standing to challenge the statute. The district court criticized Ream for failing to take steps necessary to apply for a license. *Id.* But the statute he challenges precludes him from receiving the license. The district court also faulted Ream for failing to purchase

ingredients needed to distill. *Id.* at pageID #289. But he cannot lawfully use these raw ingredients. Were he to purchase them, they would simply spoil.

***Third***, regarding the credible-threat-of-enforcement factor, the district court applied the additional factors from *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). Order, RE 33, PageID #288–92. *McKay* was also a pre-enforcement First Amendment facial challenge, there to a standing court order that precluded recording in "court related facilities." *Id.* at 865. *McKay* summarized prior Sixth Circuit cases—all of them First Amendment pre-enforcement facial challenges—and found four non-dispositive factors to consider in "some combination." *Id.* at 869.[7] Those considerations reflect concerns specific to vagueness and overbreadth cases in the First Amendment context where plaintiffs allege a "subjective chill" on speech. *See id.* at 868–69; *see also Carman*, 112 F.4th at 396. Enumerated-powers challenges like this one do not implicate the sometimes subjective allegations of chilled speech in the First

[7] Citing *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015); *Kiser v. Reitz*, 765 F.3d 601, 608–09 (6th Cir. 2014); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 452 (6th Cir. 2014); *Berry v. Schmitt*, 688 F.3d 290, 297 (6th Cir. 2012); *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 607 (6th Cir. 2008).

Amendment context.

Moreover, *McKay*'s holding does not apply. It found no credible threat of enforcement existed because (i) sheriff's deputies were instructed not to detain anyone or confiscate any device, (ii) there was no evidence the order had ever been enforced, and (iii) the plaintiff had not sought an available administrative exception. *Id.* at 869–70. The opposite is true here: (i) the government has not forsworn prosecution, (ii) the statute *has* been enforced previously (albeit in proceedings the district court found to be dated), and (iii) no administrative exception is available.

In sum, because the parties agree that the statute clearly proscribes Ream's desired conduct and the government has not disavowed prosecution, a credible threat of enforcement exists.[8] *See Babbitt*, 442 U.S. at 299, 302 (finding standing because plaintiffs "not without some reason in fearing prosecution"); *Christian Healthcare Centers, Inc. v. Nessel*, 117

[8] A post-*McKay* case, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766–67 (6th Cir. 2019), held that plaintiffs bringing a First Amendment facial challenge (an overbreadth claim) do not need to show a credible threat of enforcement. This factor, like the other two, does not easily map onto Ream's claims, but if the Court were to apply it, he too brings "facial" challenges and thus satisfies this factor.

F.4th 826, 854–55 (6th Cir. 2024) (finding a credible threat of enforcement where two of three plaintiffs alleged an intent to engage in proscribed conduct and the defendant refused to disavow enforcement).

***

The district court's wooden application of the *Driehaus* factors—developed for a different, First Amendment context—is the source of its errors. Those factors should not have been applied so rigidly outside of that context. Where the statute is clear, and the alleged conduct proscribed, plaintiffs like Ream have standing to challenge the statute.

## II. The Judiciary Plays A Critical Role Protecting The Structural Constitution Through Cases Like This One, And This Court Should Address Ream's Meritorious Claims.

The district court wrongly held that this case was not "affected with a constitutional interest." Order, RE 33, PageID #285–87. That is incorrect. This case presents an important constitutional issue that touches the core of our government's federal structure. That structure is designed to safeguard individual rights and, also by design, places the Judiciary in the unique role of resolving disputes about that structure—by addressing meritorious cases such as this one.

### A. Courts Are The Only Institutional Check To Preserve Federalism, Which Helps Protect Individual Rights.

The United States is a "compound republic" with power "divided between two distinct governments." *The Federalist* No. 51, at 270 (James Madison). The national government operates directly on the people, not through the states as in some "federal" systems. But its power "extends to certain enumerated objects only[] and leaves to the several States a residuary and inviolable sovereignty over all other objects." *The Federalist* No. 39, at 198 (James Madison). Accordingly, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000), which "are few and defined" whereas "[t]hose which are to remain in the State governments are numerous and indefinite," *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting *The Federalist* No. 45 (James Madison)).

Despite popular misconceptions about so-called "states' rights," this division of authority "does not protect the sovereignty of the States for the benefit of the States or state governments as abstract political entities …." *New York v. United States*, 505 U.S. 144, 181 (1992). "To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *Id.* As the Supreme Court

has repeatedly recognized, "[t]his constitutionally mandated division of authority 'was adopted by the Framers to ensure protection of our fundamental liberties.'" *Lopez*, 514 U.S. at 552 (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 458 (1991)); *see Printz v. United States*, 521 U.S. 898, 921 (1997) ("This separation of the two spheres is one of the Constitution's structural protections of liberty.").

The division of authority tends to resist "the accumulation of excessive power," which would threaten to encroach on individual rights. *Lopez*, 514 U.S. at 552. For the national government, the mechanism is well-known: "[G]iv[e] to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the other" because "[a]mbition must be made to counteract ambition." *The Federalist* No. 51, at 268 (James Madison). Competition among the three branches of the national government therefore tends to protect the rights of the people.

This competitive insight applies similarly to the states, *Lopez*, 514 U.S. at 552, which compete against each other because federalism "makes government more responsive by putting the States in competition for a mobile citizenry," *Gregory*, 501 U.S. at 458. People choose where to live

for any number of reasons, but also because of a state's public policies. When people "vote with their feet," they are choosing among different baskets of state policies, forcing states to compete for citizens and businesses. Michael S. Greve, *The Upside-Down Constitution* 5–7 (2012). This competition tends to improve public policy at the state level, just as competition among the federal branches does the same.

This dynamic is not expressed in a specific clause in the Constitution but instead emerges from its structure. *Id.* at 63–86. As Justice Rehnquist explained, "this Court has often relied on notions of a constitutional plan—the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers." *Nevada v. Hall*, 440 U.S. 410, 433 (1979) (Rehnquist, J., dissenting), *overruled by Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230 (2019). "The tacit postulates yielded by that ordering are as much engrained in the fabric of the document as its express provisions, because without them the Constitution is denied force and often meaning." *Id.*

Where the national government imposes one-size-fits-all schemes, the people lose the benefits of state competition. But, unlike the separation of powers at the national level, the Constitution does not supply the states with an institutional check on Congress. Congress was never expected to check itself: "[t]he legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex." *The Federalist* No. 48, at 256–57 (James Madison). Aside from the amendment process, the only constitutional mechanism to protect the states' power from federal constitutional overreach is the robust enforcement of enumerated powers.

Moreover, "[f]idelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 564 U.S. 211, 222 (2011). "Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Id.* at 223–24.

The Constitution supplies only one way to enforce those limits: the Judiciary. "[I]n controversies relating to the boundary between the two jurisdictions," national and state, the Judiciary provides "the tribunal

ultimately to decide." *The Federalist* No. 39, at 198 (James Madison). "Once we understand that federalism plays the same role as the separation of powers, the enumeration of limited national powers, and even the Bill of Rights, judicial review of federalism questions appears all the more appropriate and justified by the constitutional structure." Remarks of the Hon. Clarence Thomas, *Why Federalism Matters*, 48 Drake L. Rev. 231, 237–38 (2000).

This Court therefore has an essential role to play in protecting individual rights through structural constitutional cases like this one. "Nearly two centuries ago, Chief Justice Marshall observed that 'the question respecting the extent of the powers actually granted' to the Federal Government 'is perpetually arising, and will probably continue to arise, as long as our system shall exist.'" *NFIB v. Sebelius*, 567 U.S. 519, 533–34 (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819)). This case is yet another in that long and continuing tradition.

### B. Ream Has Shown That The Federal Prohibition On Home Distilling Exceeds Congress's Commerce Clause Power.

Once the Court resolves the errors in the district court's standing analysis, it should address this straightforward and meritorious

challenge to the federal home-distilling prohibition as beyond Congress's Commerce Clause authority. Put simply, the statute does not regulate a channel of interstate commerce, the persons or things (or instrumentalities of) interstate commerce, or an activity that substantially affects interstate commerce.

Critically, the home-distilling provision cannot survive the substantial effects test because it is not necessary to make effective a broader regulation of interstate commerce. In *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005), the regulation of the intrastate growing and gifting of marijuana was necessary to further a comprehensive federal prohibition on marijuana. That same insight holds true under *Wickard v. Filburn*, 317 U.S. 111 (1942). There, Congress enacted the Agricultural Adjustment Act of 1938, which, as applied there to wheat, was intended "to control the volume moving in interstate and foreign commerce in order to avoid surplusages and shortages and the consequently abnormally low or high wheat prices." *Id.* at 115. To control the price of wheat, the statutory scheme provided growers with a specific allotment of how much each was permitted to grow. *Id.* at 114–15. In other words, Congress was in complete control of the market for wheat, and as a result, Wickard's excess

wheat cultivation, even for home consumption, could be regulated to advance that comprehensive national scheme. *See id.* at 128–29.

The home-distilling prohibition is not such a comprehensive national scheme. As *Hobby Distillers* explains, the Federal Alcohol Administration Act "governs commerce on its face" but it is not a "comprehensive regulation of commerce of the kind that allows Congressional intervention in *every* related local activity." 740 F. Supp. 3d at 532–33 (emphasis in original). "This is because the Act does not directly regulate the supply and demand of alcohol, does not make Congress a production manager over each distillery to inflate prices, and is not part of a federal directive to either promote or eliminate a national marketplace for alcohol." *Id.* at 533.

The Court should adopt this reasoning from *Hobby Distillers* and hold that the home-distilling prohibition is beyond Congress's Commerce-Clause authority. Otherwise, the government's position threatens to expand its authority under the "substantial effects" category of Commerce Clause regulation without limit.

## CONCLUSION

For the reasons set forth above, and in Ream's opening brief, this Court should reverse the judgment below and remand with instructions to grant Ream's motion for summary judgment.

Dated: July 1, 2025

Respectfully Submitted,

*/s/ Michael A. Petrino*

Michael A. Petrino
Caleb Kruckenberg
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW
Suite 625
Washington, DC 20036
(202) 833-8400
petrino@cir-usa.org

*Counsel for* Amicus Curiae
*Center for Individual Rights*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation for an amicus brief, set by Fed. R. App. P. 29(a)(5) and Fed. R. App. 32(a)(7), because it contains 6,495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (Century Schoolbook 14-point type) using Microsoft Word.

Dated: July 1, 2025

*/s/ Michael A. Petrino*
Michael A. Petrino